Barry I. Levy
Michael A. Sirignano
Joanna Rosenblatt
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.: _____(      ) |
| Plaintiffs, | |
| -against- | |
| SKILLMAN CHEMISTS CORP. d/b/a SUNNYSIDE PHARMACY, VYACHESLAV "STEVE" KHAIMOV, and JOHN DOE DEFENDANTS "1" THROUGH "10" | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants, Skillman Chemists Corp. d/b/a Sunnyside Pharmacy, Vyacheslav "Steve" Khaimov, and John Doe Defendants "1" through "10" (collectively, "Defendants"), hereby allege as follows:

1.      GEICO brings this action to terminate a large, complex fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3 million in fraudulent no-fault claims seeking reimbursement for medically unnecessary pharmaceuticals, durable medical equipment, and orthotic devices, systematically dispensed to individuals involved in automobile accidents who were treating at numerous, different "medical clinics" located throughout the New York Metropolitan area, pursuant to collusive arrangements and predetermined fraudulent protocols.

2.      The Defendants, Skillman Chemists Corp. d/b/a Sunnyside Pharmacy ("Skillman"), its alleged owner Vyacheslav "Steve" Khaimov, R.N. ("Khaimov"), and John Doe Defendants "1" through "10" (collectively, the "Defendants"), devised the scheme to dispense, or purport to dispense, large volumes of expensive prescription drug products, along with durable medical equipment and orthotic devices, based solely on the products' high profit margins without regard to efficacy, medical necessity, or genuine patient care.  The Defendants intentionally targeted the high-profit margin prescription drug products and medical equipment, while also using sham, invalid, and/or duplicitous prescriptions, to fraudulently bill GEICO and other New York automobile insurers for allegedly dispensing the products to individuals involved in automobile accidents.

3.      As part of the fraudulent scheme and to maximize their profits, the Defendants colluded with multiple prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), in order to have large volumes of medically unnecessary prescriptions steered to Skillman without regard for the genuine needs of the patients.  Further, unlike legitimate pharmacies dispensing a wide

variety of pharmaceutical products, Skillman's business primarily targeted topical pain products, including Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, Lidothol 4.5-5% Patches, and Sumatriptan 5% Cream (together, the "Fraudulent Topical Pain Products"), and Naproxen-Esomeprazole Delayed Released (the "Fraudulent Naproxen-Esomeprazole"), billing approximately $1.8 million for these products alone.

4.      Specifically, the Defendants submitted more than $895,000.00 for Lidocaine 5% Ointment, typically at a charge of $1,219.20 to $1,702.00 per prescription; nearly $400,000.00 in fraudulent billing for Sumatriptan 5% Cream, typically at a charge $1,133.60 per prescription; over $163,000.00 for Diclofenac Sodium Gel 3%, typically at a charge of $944.00 or $1,888.00 per prescription; more than $170,000.00 for Lidothol 4.5%-5% Patches ("Lidothol Patches"), typically at a charge of $2,622.58 per prescription; and more than $150,000.00.00 for Naproxen-Esomeprazole Delayed Released (the "Fraudulent Naproxen-Esomeprazole").

5.      In addition to the Fraudulent Topical Pain Products, the Defendants exploited New York automobile accident victims, including those eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"), by dispensing, or purporting to dispense, various other prescription drug products along with the Fraudulent Topical Pain Products, including muscle relaxers and nonsteroidal anti-inflammatory drugs (collectively with the Fraudulent Topical Pain Products  the "Fraudulent Pharmaceuticals") and various items of durable medical equipment ("DME") and orthotic devices ("OD"), such as cervical traction equipment, bed boards, egg-crate mattresses, positioning pillows/cushions, heat lamps, transcutaneous electrical nerve stimulators and various lumbar, shoulder and knee braces/supports (collectively, the "Fraudulent Equipment").  The Fraudulent Pharmaceuticals and Fraudulent Equipment were not medically

necessary; not based on valid prescriptions from licensed healthcare providers; and were targeted in order to inflate the charges to GEICO.

6.     The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health, safety, and well-being. For example, the Defendants dispensed large volumes of Lidothol Patches which are classified as "unapproved" drugs by the United States Food and Drug Administration ("FDA").   The Defendants also dispensed multiple pharmaceuticals from the same therapeutic class, on the same date to the same Insured, despite obvious clinical abuse and risk of therapeutic duplication, solely to maximize their billing.

7.     By this action, GEICO seeks to recover more than $1,437,600.00 the Defendants stole from it, along with a declaration that GEICO is not legally obligated to reimburse Skillman for more than $867,900.00 in pending fraudulent New York No-Fault claims that the Defendants submitted or caused to be submitted through Skillman because:

(i)      Skillman billed for Fraudulent Pharmaceuticals and Fraudulent Equipment prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct illegal, invalid, and duplicitous prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that they acquired at low cost and caused Skillman to dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals, in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule");

(iv)    The Defendants' bills submitted to GEICO seeking reimbursement for the Fraudulent Equipment misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate the reimbursement rates, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent the equipment provided to Insureds;

(v)    The Defendants billed GEICO for Fraudulent Pharmaceuticals and Fraudulent Equipment dispensed to Insureds as a result of decisions made by laypersons rather than based upon prescriptions issued by Prescribers licensed to issue such prescriptions;

(vi)    the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals and Fraudulent Equipment through Skillman pursuant to illegal, invalid, unauthorized, and otherwise duplicitous, prescriptions.

8.    The Defendants' scheme began in 2021 and continues uninterrupted to the present day as the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO. Additionally, Defendants continue to pursue collection on their unpaid fraudulent claims against GEICO, as well as other New York automobile insurers.

9.    As discussed more fully below, the Defendants at all times have known: (i) the billed-for pharmaceutical products and DME/OD were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered illegal prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants exploited the Pharmacy Fee Schedule by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that they acquired at low cost and caused Skillman to dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; (iv) the Defendant exploited the payment formulas set forth in 12 N.Y.C.R.R. § 442.2 (2021 and 2022)

(the "DME Fee Schedule") by fraudulently mispresenting the type and nature of the Fraudulent Equipment purportedly provided to the Insureds; (v) the Fraudulent Pharmaceuticals and Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued licensed Prescribers; and (vi) the Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals and Fraudulent Equipment pursuant to illegal, invalid, unauthorized, and otherwise duplicitous prescriptions and are continuing to seek reimbursement on unpaid fraudulent claims.

10.      Based on the foregoing, the Defendants have no right to be compensated for the Fraudulent Pharmaceuticals and Fraudulent Equipment allegedly dispensed to GEICO Insureds. The charts attached at Exhibits "1" and "2" set forth the fraudulent claims identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail and/or wires seeking reimbursement under New York's No-fault law. As a result of Defendants' scheme, GEICO incurred damages of approximately $1,437,600.00.

## THE PARTIES

### I.       Plaintiffs

11.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

12.      Defendant Skillman is New York corporation incorporated on or about May 24, 2021 with its principal place of business at 48-11 Skillman Avenue, Sunnyside, Queens County, New York ("48-11 Skillman Ave").

13.     Skillman is a registered pharmacy with the New York State Education Department Office of Professions ('NYSOP") effective October 14, 2021.  Skillman also dispenses and bills for DME and OD pursuant to a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection.

14.     Khaimov resides in and is a citizen of Queens County, New York. Khaimov is the owner of record of Skillman.

15.     Prior to Skillman, from April 2020 through July 2021, Sunny RX Inc. d/b/a Sunnyside Pharmacy ("Sunny Rx") operated at 48-11 Skillman Ave until Khaimov purchased the pharmacy from Eliezer Badalbayev in or about July 2021.

16.     Khaimov was presented with the opportunity to purchase Sunny Rx by Rafael Badalov ("Badalov") – an attorney/pharmacist who is associated with numerous pharmacies and individuals suspected of engaging in No-Fault fraud schemes, including several named as defendants in various federal litigations involving healthcare goods and services rendered pursuant to fraudulent treatment protocols and collusive referral arrangements, and the improper ownership and control of No-Fault Clinics and professional corporations.   As a result of the purchase, Sunny Rx's assets, along with its lease at 48-11 Skillman Ave, were transferred to Khaimov and Skillman.

17.     Badalov assisted Skillman in registering as a pharmacy with the NYSOP and is listed as the contact on Skillman's application documents.

18.     Since Skillman became a registered pharmacy with the NYSOP, it has knowingly continued to submit fraudulent claims to GEICO seeking reimbursement for pharmaceuticals and continues to seek reimbursement on unpaid fraudulent claims. In fact, Skillman renewed its registration with NYSOP on October 1, 2024 and it is effective through September 30, 2027.

19.     Likewise, since obtaining its Dealer in Products License, Skillman has submitted

fraudulent claims to GEICO seeking reimbursement for DME and OD and continues to seek reimbursement on unpaid fraudulent claims. In fact, Skillman renewed its Dealer in Products License on March 23, 2023 and it is effective through March 15, 2025.

20.    Khaimov also used attorney/accountant Rina Esterov ("Esterov") to assist with various corporate filings on behalf of Skillman. Esterov, like Badalov, is connected to multiple healthcare providers and individuals who have been investigated and/or sued for their involvement in various No-Fault insurance fraud schemes.

21.    John Doe Defendants "1" – "10" reside in and are citizens of New York and include persons who are presently not identifiable but (i) who are associated with Khaimov and Skillman and conspired with them to further the fraudulent scheme committed against GEICO and other New York automobile insurers; and (ii) laypersons associated with the No-Fault Clinics and who conspired with Khaimov and Skillman to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

24.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

26.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of New York's No-Fault Laws**

27.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including prescription drugs, DME, and OD.  See N.Y. Ins. Law § 5102(a).

29.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). Alternatively, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

30.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary pharmaceuticals, DME, or OD provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, pharmaceuticals, DME and/or OD provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, are not reimbursable under the No-Fault Laws.

31.    Reimbursement of No-Fault benefits for medically necessary pharmaceuticals is limited to prescription drugs only.  Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

32.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

33.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

34.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    An Overview of Applicable Licensing Laws

36.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

37.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

38.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

39.     Pursuant to New York Education Law § 6808(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

40.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

42.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, contraindications for use in a specific patient, and clinical abuse or misuse.

43.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

44.     Pursuant to New York Education Law § 6810, as of March 27, 2016 "no practitioner shall issue any prescription in this state, unless such prescription is made by electronic prescription from the practitioner to a pharmacy."  Permitted exceptions include: (1) electrical or technological outages, (2) a waiver granted to the prescriber by the New York State Commissioner of Health based on a demonstrated exceptional hardship, (3) the use of electronic prescribing would cause a delay that would adversely affect the patient's health, (4) telephone prescriptions issued in emergency situations.

45.     For any non-electronic prescriptions issued in the state, New York Education Law § 6810 requires the prescriber explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

46.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

47.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

48.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

49.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

50.     A Dealer in Products License is obtained by filing a license application with the DCWP.

51.     The license application for a Dealer in Products License requires, among other things, the applicant to affirm they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made

under penalty for false statements under §§ 175.30, 175.35, and 210.45 of New York's Penal Law.

52.    Pursuant to 8 N.Y.C.R.R. § 29.1 healthcare providers in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

53.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits healthcare providers in New York from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

54.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

55.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

56.    New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications DME, and OD.

## III.    Overview of the Scheme

57.    Beginning in 2021, and continuing uninterrupted through the present day, Defendants implemented a fraudulent scheme in which they used Skillman to exploit patients for

financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to Fraudulent Pharmaceuticals and Fraudulent Equipment purportedly dispensed to Insureds.

58.    Skillman purports to be a storefront neighborhood pharmacy in Queens, New York, but has been used as a front for a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of Fraudulent Pharmaceuticals and Fraudulent Equipment in systematic, predetermined fashion.

59.    Indeed, as part of the Defendants' scheme, the Defendants targeted expensive prescription drug products (i.e., the Fraudulent Pharmaceuticals) along with durable medical equipment and orthotic devices (i.e., the Fraudulent Equipment) based solely on the products' high profit margins and ability to fraudulently inflate the charges to New York automobile insurers, without regard to efficacy, medical necessity, or genuine patient care.

60.    Unlike legitimate pharmacies, the Defendants engaged in collusive agreements with various prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), paying them kickbacks and providing other financial incentives in order to have large volumes of prescriptions – or purported prescriptions – for the Fraudulent Pharmaceuticals and Fraudulent Equipment steered to Skillman without regard to actual patient care.

61.    Unlicensed laypersons, rather than the Prescribers, working in the No-Fault Clinics create and control the patient populations at the clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.  These

predetermined protocols almost always involve the rendering and prescribing of medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

62.    For example, in support of the Defendants' claims for reimbursement, Skillman submitted prescriptions for Fraudulent Pharmaceuticals allegedly prescribed and dispensed to Insureds treating at 92-08 Jamaica Avenue, Woodhaven, New York (the "Woodhaven Clinic") and 97-01 101st Avenue, Ozone Park, New York (the "Ozone Park Clinic").  The Ozone Park Clinic and Woodhaven Clinic and have been the subject of no-fault insurer investigations with regard to their excessive fraudulent treatment and billing practices aimed at generating profits without regard to patient care.

63.    Upon information and belief, the Ozone Park Clinic and the Woodhaven Clinic are controlled by unlicensed layperson Mikhail Kushmakov ("Kushmakov"). Kushmakov, through various entities he owns, is the primary leaseholder of the Ozone Park Clinic and Woodhaven Clinic. In this capacity, he effectuates control over the clinics and their respective patient populations.  Specifically, healthcare providers pay sham "rent" to Kushmakov controlled entities in exchange for access to the patients at the Ozone Park Clinic and Woodhaven Clinic, so that they may subject the patients to medically unnecessary healthcare services and submit fraudulent billing to GEICO and other no-fault insurers.

64.    In addition to paying Kushmakov purported "rent," the healthcare providers at the Woodhaven Clinic and Ozone Park Clinic are required to issue prescriptions for pharmaceuticals, DME, and OD, which Kushmakov then routes to various pharmacies and DME suppliers, including Skillman.

65.    In fact, Skillman issued at least $300,000.00 in checks that were deposited into bank accounts held by Kushmakov. To disguise the payments to Kushmakov, Skillman issued multiple

checks, ranging from $4,000.00 to upward of $15,000.00, to various entities which have legitimate sounding names, but which have no legitimate business purposes. Indeed, despite the fact that the Defendants made these checks payable from Skillman to at least ten different entities, they were all deposited into one of two corporate accounts – both of which are accounts where Kushmakov is the sole signatory. Upon information and belief, the Defendants made these payments to Kushmakov in exchange for a steady stream of prescriptions that they could submit in support of Skillman's fraudulent billing.

66.     In keeping with the use of the Ozone Park Clinic and the Woodhaven Clinic to commit fraud and exploit Insureds, these clinics have been the source of forged and/or altered prescriptions to pharmacies in the past that operate similarly to Skillman so that those pharmacies could submit them to GEICO in support of their fraudulent billing.

67.     During a deposition in the federal litigation captioned <u>Government Employees Insurance Company, et al. v. Custom RX Pharmacy, LLC, et al.</u>, 20-cv-02622 (CBA) (SJB) (E.D.N.Y. 2020), Radha Gara, M.D. identified several prescriptions issued in his name to patients he treated at the Ozone Park Clinic and Woodhaven Clinic that were forged and/or altered to include additional pharmaceuticals he did not prescribe to the patients.

68.     Further, Skillman dispensed Fraudulent Equipment pursuant to prescriptions allegedly issued by Phyllis Gelb, M.D. ("Dr. Gelb") in connection with her work under Avenue Medical Care, PC. However, the prescriptions submitted by Skillman in Dr. Gelb's name are inconsistent with statements Dr. Gelb made under oath. Specifically, in a sworn statement Dr. Gelb stated, among other things, that she never issued prescriptions for DME or OD on a date she did not personally examine a patient and that she never in her clinical career issued prescriptions for shoulder orthotics. A review of Skillman's claims indicate they dispensed and billed for

Fraudulent Equipment pursuant to prescriptions purportedly issued on days Dr. Gelb was not treating patients at any No-Fault Clinics, as well as prescriptions for OD Dr. Gelb denies ever prescribing.

69.    Pursuant to illegal, collusive, arrangements, the Prescribers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) and routed those prescriptions to Skillman. This permitted the Defendants to submit excessive amounts of egregiously inflated claims to GEICO – totaling nearly $1.9 million – seeking reimbursement for the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole.

70.    The Defendants also paid unlawful kickbacks or provided other incentives to the Prescribers and Clinic Controllers associated with the No-Fault Clinics, in exchange for prescriptions for Fraudulent Equipment.

71.    Defendants required the prescriptions for Fraudulent Equipment to be written in a generic, vague, non-descript manner so the Defendants could misrepresent the nature and quality of the items intended by the prescriptions and the items that they actually dispensed in order to exploit the DME Fee Schedule. As a result, the Defendants were able to submit GEICO more than $500,000.00 in egregiously inflated claims seeking reimbursement for Fraudulent Equipment.

72.    As mentioned, the Defendants' scheme involving Skillman sought to defraud GEICO as well as other New York automobile insurers. In fact, the Allstate Insurance Companies filed a federal court fraud and racketeering action against Skillman in September 2024, wherein the Allstate companies alleged in detail that Skillman was part of a racketing scheme that, among other things: misrepresented that it was dispensing pharmaceuticals pursuant to valid New Yok state prescriptions, when it was not; engaged in collusive, kickback relationships to obtain

18

prescriptions for pharmaceuticals and DME, misrepresented the nature and quality of the DME it dispensed to inflate the charges; billed Allstate for DME that was never provided to its insureds, etc. See Allstate Insurance Company, et al., v. Skillman Chemists Corp., et al, 1:24-cv-06619 (PKE-LKE) (E.D.N.Y. 9/19/24).

### A.    Defendants' Billing for the Fraudulent Pharmaceuticals

73.    Defendants' scheme primarily revolved around the prescribing and dispensing of specific Fraudulent Pharmaceuticals while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

74.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Skillman's business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) which accounted for more than 78% of the Defendants' total pharmacy billing submitted to GEICO.

75.    Nearly 70% of Defendants' pharmacy billing, totaling more than $1.6 million, was for Fraudulent Topical Pain Products, while these products accounted for 56% of Skillman's overall billing.  Skillman primarily dispensed and billed for topical lidocaine and topical Sumatriptan products which they acquired at low cost and used to submit egregiously inflated claims for reimbursement.  The Fraudulent Topical Pain Products often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

76.    Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that lidocaine and diclofenac – both dispensed and billed by Skillman – are two of the most common products subject to fraud and abuse by pharmacies with

questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

77.     Defendants also submitted another $400,000.00 in billing for various extended and delayed release medications, primarily in the form of Fraudulent Naproxen-Esomeprazole. Like the Fraudulent Topical Pain Products, the Fraudulent Naproxen-Esomeprazole was medically unnecessary, clinically inappropriate, and targeted by the Defendants because it could be acquired at low cost and used to submit egregiously inflated claims for reimbursement.

78.     The prescriptions for the Fraudulent Pharmaceuticals – to the extent they were even legitimate – were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, excessive healthcare services, including prescriptions for pharmaceuticals, DME and OD, as part of predetermined protocols and collusive arrangements.

79.     The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

80.     The collusive arrangements and predetermined treatment protocols are how the Defendants were able to bill GEICO alone more than $2.4 million in Fraudulent Pharmaceuticals.

81.     In keeping with the fact that the prescriptions were the byproducts of collusive arrangements and fraudulent treatment protocols, 75% of the prescriptions for Fraudulent Pharmaceuticals routed to Skillman were purportedly authorized by just six Prescribers in their capacity as alleged employees of five professional corporations.

82.     These healthcare practices, the Prescribers they employ, and the No-Fault Clinics from where they operate have often been the subject of investigations and lawsuits commenced by

New York insurers regarding their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed solely at generating profits

83.    For example, at least $700,00.00 of Skillman's claims for pharmaceuticals resulted from prescriptions issued through by Andrew Patrick, D.O. ("Dr. Patrick") through his professional corporation MetroCare Medical, P.C. ("MetroCare"). Dr. Patrick and MetroCare were previously sued based on allegations they paid kickbacks for patient referrals and allowed unlicensed laypersons to illegally exercise ownership and control over MetroCare. See Allstate Ins. Co. et al v. Bradley Pierre, 1:15-cv-05556(ERK)(CLP) (E.D.N.Y. 2015). Dr. Patrick was also sued based on allegations he issued prescriptions for medically unnecessary pharmaceuticals pursuant to predetermined protocols and in exchange for kickbacks. See Government Employees Ins. Co. et al v. Wellmart RX Inc., et al, 1:19-cv-04414(KAM)(RLM)(E.D.N.Y. 2019).

84.    As a further example, at least $365,000.00 of Skillman's claims for pharmaceuticals resulted from prescriptions issued through Atlantic Medical and Diagnostic, P.C. ("Atlantic Medical"), mostly authorized by Aleksandr Kopach, P.A. ("PA Kopach"). Atlantic Medical is owned by Jonathan Landow, M.D. ("Dr. Landow"). Dr. Landow and several of his other professional corporations, including Atlantic Medical's predecessor – Macintosh Medical, P.C. – have been sued multiple times for, among other things, allegedly rendering medically unnecessary healthcare services pursuant to fraudulent billing and treatment protocols. See Allstate Ins. Co. et al v. Landow, M.D. et al, 1:24-cv-02010(DLI)(JRC)(E.D.N.Y. 2024); United Services Automobile Association et al v. Landow M.D. et al, 1:24:03471(NRM)(MMH)(E.D.N.Y. 2024); Government Employees Ins. Co. et al v. Landow, et al, 1:21-cv-01440 (NGG)(RER)(E.D.N.Y. 2021). Notably, Skillman also received prescriptions through Macintosh Medical, P.C.

85.     Additionally, at least $230,400.00 of Skillman's claims for pharmaceuticals resulted from prescriptions issued by Colin Clarke, M.D. ("Dr. Clarke") through Colin Clarke MD, P.C. ("Clarke PC"). Dr. Clarke and the Clarke PC have been sued by several insurers based on allegations Dr. Clarke allowed unlicensed laypersons to illegally exercise ownership and control over Clarke PC and submitted fraudulent claims for medically unnecessary healthcare services rendered pursuant to fraudulent protocols and illegal kickback and referral arrangements. See Government Employees Ins. Co. et al v. Clarke et al, 1:23-cv-046059(FB)(PK)(E.D.N.Y. 2023); Dr. Clarke was also sued for his alleged involvement in a no-fault fraud scheme to prescribe and bill for medically unnecessary DME. See Government Employees Ins. Co. et al v. Exon Medical Equipment, Inc. et al, 1:20-cv-04257(RRM)(PK)(E.D.N.Y. 2020).

86.     Further, at least than $106,000.00 of Skillman's claims for pharmaceuticals resulted from prescriptions issued through by Conrad Cean, M.D. ("Dr. Cean") through his professional corporation Conrad Cean MD, PLLC. ("Cean PLLC"). Dr. Cean and was previously sued based on allegations he issued prescriptions for medically unnecessary pharmaceuticals pursuant to predetermined protocols and in exchange for kickbacks. See Government Employees Ins. Co. et al v. Wellmart RX Inc., et al, 1:19-cv-04414(KAM)(RLM)(E.D.N.Y. 2019). Dr. Cean was also sued based on allegations he submitted millions of dollars in no-fault claims for medically unnecessary healthcare services through various entities he owned, including Cean PLLC, pursuant to a fraud scheme involving illegal self-referrals and kickbacks arrangements. See Government Employees Ins. Co. et al v. 5 Borough Anesthesia, P.L.L.C. et al, 1:20-cv-04305(PKC)(RML)(E.D.N.Y. 2020).

87.     The Defendants also intentionally submitted purported "telephone" prescriptions – which they obtained from Clinic Controllers pursuant to the collusive agreements and fraudulent protocols discussed herein – to claim reimbursement for the Fraudulent Pharmaceuticals.

88.     As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

89.      In the limited circumstances in which a prescription is exempt from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.  See N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

90.     The limited exceptions to the electronic prescription requirement include: (i) temporary technological or electronic failure, (ii) a waiver granted to the prescriber by the New York State Commissioner of Health, (iii) a determination by the prescriber that it would be impractical for patients to receive prescriptions in a timely manner if prescribed electronically and would adversely affect patient health, (iv) the prescription will be dispensed by a pharmacy outside of New York State, or (v) a prescription issued via telephone strictly due to an emergency situation. See N.Y. Public Health Law § 281.

91.     In the event a prescription is issued telephonically, the pharmacist receiving the prescription must make a contemporaneous record reflecting the date and time of the telephone prescription and the prescriber who authorized the prescription.  In the event the telephone

prescription is called in by an employee of the prescriber, the pharmacist must make a good faith effort to verify the employee's identity.  See N.Y. Education Law § 6810.

92.    It is highly unlikely that Skillman received valid telephone prescriptions from multiple Prescribers that would accord with the limited exceptions under the law.  Further, to the extent that Skillman received any such telephone prescriptions, Skillman's printed "telephone Rx" records fail to provide any information that verifies the identity of the person calling in the oral prescription or the reason for the prescription being issued by telephone.

93.    Nevertheless, Skillman submitted billing to GEICO pursuant to purported telephone prescriptions issued pursuant to predetermined fraudulent treatment and billing protocols, and collusive arrangements. Samples of the purported "telephone Rx" prescriptions submitted to GEICO in support of their fraudulent claims for reimbursement are attached at Exhibit "3".

93.    Notably, despite the fact the Prescribers issued these prescriptions via telephone rather than electronically, the patient health records do not indicate the specific exempt reason for why the prescriptions were not issued electronically, as required by law.

94.    For example –

- Insured TP was allegedly involved in a motor vehicle accident on December 3, 2023. On January 2, 2024, TP sought treatment with Khondeker Rahman, MD ("Dr. Rahman") at KMR Medical Care PC ("KMR Medical") at a No-Fault Clinic located at 4104 Farragut Road, Brooklyn, NY (the "Farragut Road Clinic"). On January 15, 2024, Skillman dispensed Lidocaine 5% Ointment to TP pursuant to a telephone prescription allegedly issued by Dr. Rahman on January 3, 2024. Thereafter, on March 12, 2024, TP sought treatment with Moshtaq Ahmed PA ("PA Ahmed") and David Carmili MD ("Dr. Carmili") at Palmetto Medical PC ("Palmetto Medical") at the Farragut Road Clinic. On March 4, 2024, eight days before TP's initial evaluation with Dr. Carmili and PA Ahmed, Skillman dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen-Sodium to TP pursuant to telephone prescriptions purportedly ordered by Dr. Carmili on March 13, 2024 – nine days after the Fraudulent Pharmaceuticals were dispensed to TP by Skillman.

- Insured YT was allegedly involved in a motor vehicle accident on June 12, 2023. Later that day, YT sought treatment with Bela Aloyts DO ("Dr. Aloyts") at 21st Century Medical PC ("21st Century Medical") at a No-Fault Clinic located at 305 Ocean View Avenue, Brooklyn, NY (the "Ocean View Clinic"). On June 15, 2023, Skillman dispensed Lidocaine 5% Ointment to YT pursuant to a telephone prescription ordered by Dr. Aloyts on June 14, 2024. Thereafter, on July 12, 2023, Skillman again dispensed Lidocaine 5% Ointment to YT pursuant to the same telephone prescription, allegedly authorized by Dr. Aloyts on June 14, 2023. Notably, despite the fact Skillman submitted an alleged telephone prescription dated June 14, 2023 and purportedly issued by Dr. Aloyts in support of its claims for Fraudulent Pharmaceuticals dispensed on June 15, 2023 and again on July 12, 2023, one record of the telephone prescription purports to allow for two refills and the other allows for no refills – indicating one of the records was altered to allow Defendants to submit additional fraudulent billing through Skillman.

- Insured LA was allegedly involved in a motor vehicle accident on April 25, 2022. On July 27, 2022, LA sought treatment with Nadine Yamout PA ("PA Yamout") and Joseph A. Raia MD PC (the "Raia PC") at the Woodhaven Clinic. On August 22, 2022, Skillman dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Meloxicam to LA pursuant to telephone prescriptions ordered by PA Yamout on July 28, 2022.

- Insured SD was allegedly involved in a motor vehicle accident on April 14, 2022. On July 27, 2022, SD sought treatment with PA Yamout and the Raia PC at the Ozone Park Clinic. Thereafter, on August 17, 2022, Skillman dispensed Lidocaine 5% Ointment and Meloxicam to SD pursuant to a telephone prescription issued by PA Yamout on July 27, 2022.

- Insured MDB was allegedly involved in a motor vehicle accident on July 25, 2021. On August 10, 2021, MDB sought treatment with Eric Kenworthy MD ("Dr. Kenworthy") and the Raia PC at the Ozone Park Clinic. On June 3, 2022, Skillman dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen to MDB pursuant to telephone prescriptions purportedly ordered by Dr. Kenworthy nearly ten months prior, on August 10, 2021.

- Insured SV was allegedly involved in a motor vehicle accident on April 18, 2023. Thereafter, SV sought treatment at the Farragut Road Clinic. On May 23, 2023, Skillman dispensed Lidocaine 5% Ointment and Naproxen to SV pursuant to telephone prescriptions purportedly ordered by Pauline Raitses DO ("Dr. Raitses") on May 8, 2023. There is no evidence SV treated with Dr. Raitses at any time. Thereafter, on June 6, 2023, SV sought treatment with Dr. Rahman and KMR Medical at the Farragut Road Clinic. On June 26, 2023, Skillman dispensed Lidocaine 5% Ointment to SV pursuant to a telephone prescription ordered by Dr. Rahman on June 7, 2023.

- Insured AC was allegedly involved in a motor vehicle accident on July 25, 2021. On August 10, 2021, AC sought treatment with Dr. Kenworthy and the Raia PC at

the Ozone Park Clinic. On August 24, 2021, Skillman dispensed Lidocaine 5% Ointment, Lidocaine 5% Patches, and Cyclobenzaprine to AC pursuant to telephone prescriptions ordered by Dr. Kenworthy on August 10, 2021. Notably, as discussed in further detail below, the simultaneous prescription of Lidocaine 5% Ointment and Lidocaine 5% Patches constitutes therapeutic duplication.

- Insured DB was allegedly involved in a motor vehicle accident on May 17, 2022. On July 26, 2022, DB sought treatment with Dr. Kenworthy and the Raia PC at the Ozone Park Clinic. On August 17, 2022, Skillman dispensed Lidocaine 5% Ointment and Cyclobenzaprine to DB pursuant to telephone prescriptions ordered by Dr. Kenworthy on July 26, 2022.

- Insured BA was allegedly involved in a motor vehicle accident on February 19, 2024. Thereafter, on March 19, 2024, BA sought treatment with Dr. Camili and Palmetto Medical at the Farragut Road Clinic. On April 3, 2024, Skillman dispensed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to BA pursuant to telephone prescriptions ordered by Dr. Carmili on March 20, 2024. On June 3, 2024, Skillman dispensed Naproxen-Esomeprazole to BA pursuant to a telephone prescription ordered by Dr. Carmili on May 29, 2024.

- Insured SJL was allegedly involved in a motor vehicle accident on June 29, 2023. Thereafter, SJL sought treatment with Dr. Rahman and KMR Medical and the Farragut Road Clinic. On July 18, 2023, Skillman dispensed Lidocaine 5% Ointment to SJL pursuant to a telephone prescription ordered by Dr. Rahman on July 12, 2023. On August 28, 2023, Skillman dispensed Lidocaine 5% Ointment to SJL pursuant to a telephone prescription ordered by Dr. Rahman on August 16, 2023.

95.     In keeping with the fact that the telephone prescriptions did not legitimately meet any of New York State's exceptions to the electronic prescribing requirements, and were issued pursuant to the collusive agreements and fraudulent protocols discussed herein, at least $180,000.00 of Skillman's claims for pharmaceuticals resulted primarily from telephone prescriptions issued by David Carmili, M.D. ("Dr. Carmili") or his physician assistant, both working under the name Palmetto Medical PC.  Palmetto Medical PC and Dr. Carmili have been named as defendants in a fraudulent scheme relating to billing for medically unnecessary and illusory healthcare services purportedly provided to Insureds on a transient basis at various "clinic" locations in the New York area. See Government Employees Ins. Co. et al v. All Boro Medical Services, P.C., et al, 1:24-cv-01576-RPK-JAM (E.D.N.Y. 2024).

96.    In addition to the fraudulent telephone prescriptions, Skillman also dispensed and billed for Fraudulent Pharmaceuticals on occasion pursuant to prescriptions issued on invalid preprinted template prescription forms.   The preprinted template prescription forms (the "Fraudulent Prescription Forms") were nothing more than "checklist" type order forms that enabled Prescribers to simply check-off or circle predetermined Fraudulent Pharmaceuticals that were already printed on the forms.   These forms are plainly official serialized New York State prescription blanks are, therefore, are invalid.

97.    The Defendants and Clinic Controllers caused the Prescribers to use the Fraudulent Prescription Forms, in violation of law, to further facilitate the prescription of the targeted Fraudulent Pharmaceuticals and the steering of those prescriptions to the Defendants to submit in support of their fraudulent claims for reimbursement.   Samples of the Fraudulent Prescription Forms Defendants submitted to GEICO in support of their fraudulent claims for reimbursement are attached at Exhibit "4".   Further, Skillman purported to fill these invalid prescriptions ignoring its duties as a pharmacy.

98.    In keeping with the fact that the Defendants illegally steered the Prescribers and Clinic Controllers at the No-Fault Clinics to provide Skillman with prescriptions for the Fraudulent Pharmaceuticals, Insureds were never given the option to use a pharmacy of their choosing.

99.    In some cases, the Fraudulent Pharmaceuticals were dispensed to Insureds – primarily by receptionists at the No-Fault Clinics – without the patient even knowing that they were to receive a Fraudulent Pharmaceutical or who prescribed it.

100.    The Defendants colluded with the Prescribers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Skillman, regardless of the distance of the pharmacy from the Insureds or the No-Fault Clinics where they were treating, and

regardless of the fact there were countless other pharmacies located much closer to the Insureds' individual residences and the No-Fault Clinics.

101.    In fact, nearly 85% of Insureds who purportedly received Fraudulent Pharmaceuticals dispensed by the Defendants lived outside of Queens County, New York where Skillman is located.

102.    But for the Defendants' illegal, collusive agreements, Insureds would not have received pharmaceutical products from a pharmacy located in a county outside of their individual places of residence, bypassing countless other pharmacies located much closer to them.

103.    The Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Skillman, notwithstanding its inconvenient location to the Insureds' individual residences and places of treatment because the prescriptions were issued pursuant to illegal, collusive agreements among the Defendants, Prescribers, and Clinic Controllers.

104.    The illegal, collusive arrangements and predetermined treatment protocols at the No-Fault Clinics are how the Defendants were able to bill GEICO alone over $2.4 million for the Fraudulent Pharmaceuticals dispensed through Skillman.

105.    The Defendants engaged in the pharmaceutical fraud scheme involving the Prescribers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to predetermined protocols designed to exploit the patients for financial gain without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing submitted through Skillman to insurers, including GEICO and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that they acquired at

28

low cost and dispensed in large volumes to Insureds at inflated charges; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have equivalent therapeutic effects and available at a fraction of the cost; and (v) the Defendants submitted and continue to submit fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous prescriptions, and continue to seek collection on unpaid fraudulent claims.

**(1) The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Genuine Regard for Patient Care**

106.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Skillman – were virtually always subjected to predetermined and unnecessarily prolonged treatment protocols, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

107.    Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most prescribed analgesic medications worldwide, and their efficacy for treating acute pain is well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

108.    More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

109.    Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines state that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 36); New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32).

110.    Prescriptions drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events. For example, proton pump inhibitors such as esomeprazole should only be prescribed to patients at high risk for NSAID-induced gastrointestinal bleeding. At-risk patients include elderly patients, diabetics, cigarette smokers, and those with a history of prior gastrointestinal bleeding. Id. at 37. Also included in this high-risk

group are patients taking medications for other indications such as patients taking aspirin for cardiovascular protection following stroke or heart attack, or patients taking anticoagulants due to history of recurrent blood clots or atrial fibrillation.

111.    Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

112.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

113.    With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs such as Diclofenac Sodium in 1% concentrations, which is available over the counter, have shown that they are no more effective than a placebo.

114.    Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

115.    Notwithstanding the creation of their examination reports, the Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Skillman were based on

predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

116. As an example, Clinic Controllers routinely caused patients treated at their respective No-Fault Clinics to be referred for psychological evaluations with Dr. Patrick through his professional corporation, MetroCare. Per MetroCare's examination reports, virtually every patient examined by Dr. Patrick who received prescriptions authorized by him and dispensed by Skillman allegedly reported being "dazed", "panicky", and/or "frightened", among other symptoms, and was noted to have pain, headaches, insomnia/restlessness, anxiety, nervousness in traffic, and restricted social activities due to limited and painful ranges of motion.

117. For example, the following excerpts are from Dr. Patrick's initial examination reports of various Insureds. Despite the fact the Insureds are of different ages and physical conditions, with varying medical histories and accident circumstances, their examination reports document nearly identical symptoms and diagnoses.

- At the time of his initial examination, Dr. Patrick reported that Insured IE was the 40-year-old male driver of a motor vehicle struck on the front driver side.

**IMMEDIATE POST-ACCIDENT SYMPTOMS**

Headaches___ Neck pain___ Dizziness___ Unsteady gait___ Nausea___ Vomiting___
Sense of "being in a daze"___ Horrified___ Panicky___ Shocked___ Frightened___
Sense of numbing/detachment___ Loss of consciousness/Period_____

**FUNCTIONAL DECLINE SINCE THE ACCIDENT**

Social Activities: *Restricted, limited 2° painful ROM*
Occupational Performance *Painful*
Academic Performance: _____
Family Relationships: _____
Cognitive/Anxiety while driving: *Nervous while in traffic*
Personal Health Status: *Pain, insomnia, Headache*

# PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

## Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.
F43.22 Adjustment Disorder with Anxiety.
F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

## Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

- ☐ F43.21 Adjustment Disorder with Depressed Mood.
- ☐ F43.22 Adjustment Disorder with Anxiety.
- ☐ F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
- ☐ F43.0 Acute Stress Disorder.
- ☐ F43.10 Post-Traumatic Stress Disorder, Acute onset.
- ☐ F45.8 Brief Somatic Symptom Disorder.
- ☐ F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response.
- ☐ F06.31 Mood disorder due to Pain syndrome with Depressive Features.
- ☐ F06.4 Anxiety disorder due to Pain syndrome.
- ☐ G47.0 Insomnia Due to Pain Syndrome.
- OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:
- ☐ Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.
- ☐ Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.
- ☐ G44.309 Post-traumatic headache, unspecified.

- At the time of his initial examination, Dr. Patrick reported that Insured IB was the 22-year-old female backseat passenger of a vehicle struck on the front passenger side.

## IMMEDIATE POST-ACCIDENT SYMPTOMS

Headaches___ Neck pain___ Dizziness___ Unsteady gait___ Nausea___ Vomiting___
Sense of "being in a daze"___ Horrified___ Panicky___ Shocked / Frightened___
Sense of numbing/detachment___ Loss of consciousness/Period___

## FUNCTIONAL DECLINE SINCE THE ACCIDENT

Social Activities: _Limitations, restrictions 2° painful Rom,_
Occupational Performance _↑ painful, ↑ effortful daily_
Academic Performance: _work-line functioning_
Family Relationships: _↑ effortful itkse_
Cognitive/Anxiety while driving: _Nervous I when in Traffic_
Personal Health Status: _Headache, insomnia, anxiety_

## PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

### Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.
F43.22 Adjustment Disorder with Anxiety.
F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

### Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

☐ F43.21 Adjustment Disorder with Depressed Mood.
☐ F43.22 Adjustment Disorder with Anxiety.
☐ F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
☐ F43.0 Acute Stress Disorder.
☐ F43.10 Post-Traumatic Stress Disorder, Acute onset.
☐ F45.8 Brief Somatic Symptom Disorder.
☐ F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response..
☐ F06.31 Mood disorder due to Pain syndrome with Depressive Features.
☐ F06.4 Anxiety disorder due to Pain syndrome.
☐ G47.0 Insomnia Due to Pain Syndrome.
OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:
☐ Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.
☐ Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.
☐ G44.309 Post-traumatic headache, unspecified.

- At the time of his initial examination, Dr. Patrick reported that Insured IJ was the 36-year-old male driver of a vehicle that was sideswiped on the passenger side.

## IMMEDIATE POST-ACCIDENT SYMPTOMS    imp

Headaches ___ Neck pain ___ Dizziness ___ Unsteady gait ___ Nausea ___ Vomiting ___
Sense of "being in a daze" ___ Horrified ___ Panicky ___ Shocked / Frightened ___
Sense of numbing/detachment ___ Loss of consciousness/Period ___

### FUNCTIONAL DECLINE SINCE THE ACCIDENT

Social Activities: Restricted 2° treatment time, pain
Occupational Performance ___
Academic Performance: ___
Family Relationships: ___
Cognitive/Anxiety while driving: Nervous while in traffic
Personal Health Status: Pain, Insomnia, Headache

34

# PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

## Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.

F43.22 Adjustment Disorder with Anxiety.

F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.

F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

## Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

☐  F43.21 Adjustment Disorder with Depressed Mood.

☐  F43.22 Adjustment Disorder with Anxiety.

☐  F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.

☐  F43.0 Acute Stress Disorder.

☐  F43.10 Post-Traumatic Stress Disorder, Acute onset.

☐  F45.8 Brief Somatic Symptom Disorder.

☐  F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response.

☐  F06.31 Mood disorder due to Pain syndrome with Depressive Features.

☐  F06.4 Anxiety disorder due to Pain syndrome.

☐  G47.0 Insomnia Due to Pain Syndrome.

OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:

☐  Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.

☐  Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.

☐  G44.309 Post-traumatic headache, unspecified.

- At the time of his initial examination, Dr. Patrick reported that Insured TV was the 40-year-old female backseat passenger of a motor vehicle that was sideswiped on the passenger side.

## IMMEDIATE POST-ACCIDENT SYMPTOMS

Headaches___ Neck pain___ Dizziness___ Unsteady gait___ Nausea___ Vomiting___
Sense of "being in a daze"___ Horrified___ Panicky___ Shocked / Frightened___
Sense of numbing/detachment___ Loss of consciousness/Period___

## FUNCTIONAL DECLINE SINCE THE ACCIDENT

Social Activities: Limited, restricted 2°↓ Rom

Occupational Performance ↑ painful, ↑ effortful

Academic Performance:

Family Relationships:

Cognitive/Anxiety while driving: Nervous while in traffic

Personal Health Status: pain, insomnia, headache

# PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

## Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.
F43.22 Adjustment Disorder with Anxiety.
F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

## Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

- ☐ F43.21 Adjustment Disorder with Depressed Mood.
- ☐ F43.22 Adjustment Disorder with Anxiety.
- ☐ F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
- ☐ F43.0 Acute Stress Disorder.
- ☐ F43.10 Post-Traumatic Stress Disorder, Acute onset.
- ☐ F45.8 Brief Somatic Symptom Disorder.
- ☐ F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response.
- ☐ F06.31 Mood disorder due to Pain syndrome with Depressive Features.
- ☐ F06.4 Anxiety disorder due to Pain syndrome.
- ☐ G47.0 Insomnia Due to Pain Syndrome.
- OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:
- ☐ Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.
- ☐ Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.
- ☐ S44.309 Post-traumatic headache, unspecified.

- At the time of his initial examination, Dr. Patrick reported that Insured JJ was the 20-year-old female backseat passenger of a motor vehicle that was sideswiped on the passenger side.

## IMMEDIATE POST-ACCIDENT SYMPTOMS

Headaches___ Neck pain___ Dizziness___ Unsteady gait___ Nausea___ Vomiting___
Sense of "being in a daze"___ Horrified___ Panicky___ Shocked / Frightened___
Sense of numbing/detachment___ Loss of consciousness/Period___

## FUNCTIONAL DECLINE SINCE THE ACCIDENT

Social Activities: _Restricted, limited 2° painful Rom_
Occupational Performance _↑ painful, ↑ effortful_
Academic Performance: _____
Family Relationships: _____
Cognitive/Anxiety while driving: _Nervous while in traffic_
Personal Health Status: _Pain, Insomnia, Headache_

## PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

### Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.

F43.22 Adjustment Disorder with Anxiety.

F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.

F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

### Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

- ☐ F43.21 Adjustment Disorder with Depressed Mood.
- ☐ F43.22 Adjustment Disorder with Anxiety.
- ☐ F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
- ☐ F43.0 Acute Stress Disorder.
- ☐ F43.10 Post-Traumatic Stress Disorder, Acute onset.
- ☐ F45.8 Brief Traumatic Symptom Disorder.
- ☐ F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response.
- ☐ F06.31 Mood disorder due to Pain syndrome with Depressive Features.
- ☐ F06.4 Anxiety disorder due to Pain syndrome.
- ☐ G47.0 Insomnia Due to Pain Syndrome.
  OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:
- ☐ Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.
- ☐ Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.
- ☐ G44.309 Post-traumatic headache, unspecified.

- At the time of his initial examination, Dr. Patrick reported that Insured IS was the 25-year-old male backseat passenger of a motor vehicle struck in the rear.

## IMMEDIATE POST-ACCIDENT SYMPTOMS

Headaches Neck pain Dizziness Unsteady gait Nausea Vomiting
Sense of "being in a daze" Horrified Panicky Shocked Frightened
Sense of numbing/detachment___ Loss of consciousness/Period_____

### FUNCTIONAL DECLINE SINCE THE ACCIDENT

Social Activities: *restricted, limited 2° painful Rom*
Occupational Performance *↑ effortful, ↑ painful*
Academic Performance: _____
Family Relationships: _____
Cognitive/Anxiety while driving: *nervous when in traffic*
Personal Health Status: *pain, headache, insomnia*

## PROVISIONAL DIAGNOSTIC IMPRESSION AND MANAGEMENT PLAN

### Provisional Diagnostic Impression

F43.21 Adjustment Disorder with Depressed Mood.
F43.22 Adjustment Disorder with Anxiety.
F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
F43.25 Adjustment Disorder with mixed Disturbance of Emotions and Conduct

### Differential Diagnostic Considerations

The following is a list of differential diagnostic options (Based on DSM 5 diagnostic categories (Eff. May 1, 2013) compatible with ICD-10-CM codes):

- ☐ F43.21 Adjustment Disorder with Depressed Mood.
- ☐ F43.22 Adjustment Disorder with Anxiety.
- ☐ F43.23 Adjustment Disorder with Mixed Anxiety and Depressed mood.
- ☐ F43.0 Acute Stress Disorder.
- ☐ F43.10 Post-Traumatic Stress Disorder, Acute onset.
- ☐ F45.8 Brief Somatic Symptom Disorder.
- ☐ F54 Psychological Factor(s) Associated with Pain syndrome: Mental disorder; Psychological symptom(s); Coping style; Stress-related physiological response.
- ☐ F06.31 Mood disorder due to Pain syndrome with Depressive Features.
- ☐ F06.4 Anxiety disorder due to Pain syndrome.
- ☐ G47.9 Insomnia Due to Pain Syndrome.
  OTHER CONDITIONS THAT MAY BE A FOCUS OF CLINICAL ATTENTION:
- ☐ Z63.0 Relationship Distress with Spouse or Intimate Partner. Z62.820 Parent-Child problem.
- ☐ Z55.9 Academic problem. Z56.9 Other Problem Related to Employment.
- ☐ G44.309 Post-traumatic headache, unspecified.

118.    As a result of these boilerplate initial examinations, Dr. Patrick virtually always issued prescriptions for each (1) Duloxetine HCl Delayed Released ("Duloxetine") – an antidepressant pain medication used to treat diabetic peripheral neuropathy and fibromyalgia, for which Skillman typically charges $377.28 to $471.09; (2) Somnicin – an over-the-counter multi-ingredient dietary nutritional supplement for which Skillman typically charges $575.04 to $718.80 per prescription; and (3) Sumatriptan 5% Cream, for which Skillman typically charges a total of $1,133.60 per prescription, which is available in oral form and used to treat migraine and cluster headaches.  Notably, to fill the prescriptions for Sumatriptan 5% Cream allegedly authorized by Dr. Patrick, Defendants purchased Sumatriptan in its oral form and compounded the medication themselves. This allowed Defendants to maximize their billing by submitted claims for both

ingredients needed to make the cream typically charging $128.00 per prescription for the cream base and $1,005.60 per prescription for Sumatriptan oral tablets.

119.    Pursuant to the fraudulent scheme discussed herein, prescriptions were then routed to Skillman and typically resulted in Defendants submitting charges to GEICO for approximately $2,100.00 per patient.  For instance -

- Insured AC was allegedly involved in a motor vehicle accident on April 25, 2024. On May 14, 2024, AC underwent an initial examination with Dr. Patrick of MetroCare at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, NY 11212 (the "East 98th Street Clinic") at which time Dr. Patrick noted AC was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "panicky", "frightened", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", "fears to be in a car", "anxiety", and "headaches". On May 20, 2024, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to AC pursuant to prescriptions issued by Dr. Patrick on May 14, 2024.

- Insured IM was allegedly involved in a motor vehicle accident on September 3, 2023. On September 15, 2023, IM underwent an initial examination with Dr. Patrick of MetroCare at the East 98th Street Clinic at which time Dr. Patrick noted IM was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On September 19, 2023, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to IM pursuant to prescriptions issued by Dr. Patrick on September 17, 2023.

- Insured AR was allegedly involved in a motor vehicle accident on January 20, 2023. On February 28, 2023, AR underwent an initial examination with Dr. Patrick of MetroCare at a No-Fault Clinic located 3041 Avenue U, Brooklyn, NY (the "Avenue U Clinic") at which time Dr. Patrick noted AR was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "panicky", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On March 3, 2023, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to AR pursuant to prescriptions issued by Dr. Patrick on February 28, 2023.

- Insured SB was allegedly involved in a motor vehicle accident on December 9, 2022. On December 27, 2022, SB underwent an initial examination with Dr. Patrick of MetroCare at the Avenue U Clinic at which time Dr. Patrick noted SB was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following

psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On December 30, 2022, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to SB pursuant to prescriptions issued by Dr. Patrick on December 27, 2022.

- Insured PS was allegedly involved in a motor vehicle accident on October 12, 2023. On October 13, 2023, PS underwent an initial examination with Dr. Patrick of MetroCare at a No-Fault Clinic located 2232 Kimball Street, Suite A, Brooklyn, New York (the "Kimball Street Clinic") at which time Dr. Patrick noted PS was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On October 24, 2023, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to PS pursuant to prescriptions issued by Dr. Patrick on October 14, 2023.

- Insured SF was allegedly involved in a motor vehicle accident on June 7, 2024. On June 28, 2024, SF underwent an initial examination with Dr. Patrick of MetroCare at the Kimball Street Clinic at which time Dr. Patrick noted SF was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "panicky", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On July 26, 2024, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to SF pursuant to prescriptions issued by Dr. Patrick on June 29, 2024.

- Insured JR was allegedly involved in a motor vehicle accident on October 12, 2023. On October 13, 2023, JR underwent an initial examination with Dr. Patrick at the Kimball Street Clinic at which time Dr. Patrick noted JR was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On October 25, 2023, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to JR pursuant to prescriptions issued by Dr. Patrick on October 14, 2023.

- Insured WC was allegedly involved in a motor vehicle accident on July 30, 2022. On August 5, 2022, WC underwent an initial examination with Dr. Patrick of MetroCare at the 79th Street Clinic at which time Dr. Patrick noted WC was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", "neck pain", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On September 1, 2022, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to WC pursuant to prescriptions issued by Dr. Patrick on August 25, 2022.

- Insured AJ was allegedly involved in a motor vehicle accident on November 13, 2022.

On December 8, 2022, AJ underwent an initial examination with Dr. Patrick of MetroCare at a No-Fault Clinic located at 5205 Church Avenue, Ground Floor, Brooklyn, NY at which time Dr. Patrick noted AJ was experiencing the following post-accident symptoms: "[s]ense of being in a daze", "frightened", and "headaches". Dr. Patrick further noted, among others, the following psychiatric complaints: "flashbacks", "sleep problems", "irritable", "low energy", "physical restrictions", and "fears to be in a car". On December 14, 2022, Skillman dispensed Duloxetine, Sumatriptan 5% Cream, and Somnicin to AJ pursuant to prescriptions issued by Dr. Patrick on December 9, 2022.

120. Notably, Duloxetine is an antidepressant known as a serotonin-noradrenaline reuptake inhibitor (SNRI), which works by increasing the amount of mood-enhancing chemicals (e.g., serotonin and noradrenaline) in the brain. The FDA-approved indicated uses for Duloxetine include major depressive disorder, generalized anxiety disorder, diabetic peripheral neuropathic pain, and chronic musculoskeletal pain due to osteoarthritis. Risks and side effects of Duloxetine include suicidal thoughts, hepatotoxicity, and abnormal bleeding (which increases with the use of NSAIDs), among other serious risks and side effects. Lastly, the prescribing information for Duloxetine recommends the dosage be reduced gradually and never discontinued abruptly in order to prevent withdrawal symptoms.

121. Despite these indications and serious risks and side effects, Dr. Patrick virtually always prescribed Duloxetine to his patients upon initial examination due to "pain" or "anxiety" with no documented follow-up.

122. In fact, Dr. Patrick's follow-up examination reports include sections entitled "Medication Prescription(s); Dose Adjudgments," "Review of Side Effects/Adverse Reactions," and "Medication Response Analysis" which are almost always left blank.

123. In keeping with the fact that the prescriptions dispensed and billed by Skillman were the product of predetermined protocols at the No-Fault Clinics and collusive arrangements among the Defendants, Prescribers, and Clinic Controllers, nearly 100% of the prescriptions authorized by Dr. Patrick and filled by Skillman were for Duloxetine, Somnicin, and Sumatriptan

41

5% Cream prescribed to Insureds at their initial psychological evaluations and resulting in over $777,000.00 in fraudulent claims to GEICO.

124.     Additionally, to the extent the Prescribers performed an examination, they often (i) failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals; and/or (ii) inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

125.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

126.     The Prescribers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Skillman.

127.     The Prescribers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Skillman were actually used by the patient and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

128.     At times, the Prescribers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical.

129.     There is no legitimate medical reason for the Prescribers to prescribe excessive amounts of Fraudulent Pharmaceuticals to Insureds, particularly given the availability of over-the-counter medications, and the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed. Such review shall include screening for

potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

130.    Clearly, the Fraudulent Pharmaceuticals, as identified in Exhibit "1", were prescribed pursuant to collusive arrangements and predetermined treatment protocols without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications with proven therapeutic effects available over-the-counter at a fraction of the cost.

i.    **The Fraudulent Lidocaine Ointment and Diclofenac Prescriptions**

131.    In accordance with Defendants' fraudulent scheme, and despite the best practices outlined above, Skillman routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products, mostly in the form of Lidocaine 5% Ointment, but also including Diclofenac Sodium Gel 3%, pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

132.    The Defendants solicited the Prescribers and the Clinic Controllers to provide Skillman with voluminous prescriptions for Fraudulent Topical Pain Products because the Defendants could readily buy them at low cost and bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

133.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.

134.    Topical lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain and is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

135.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

136.    The NYS WCB has acknowledged the risks of adverse side effects associated with topical pain medications such as lidocaine, specifically stating in its published guidelines that "topical agent[s] should be prescribed with strict instructions for application and maximum number of applications per day to obtain the desired benefit and avoid potential toxicity." See NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 38); NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 34).

137.    Prescribers virtually never indicated the maximum dosage on any prescriptions.

138.    To the contrary, Prescribers often instructed Insureds to apply Lidocaine 5% Ointment daily "as needed".

139.    At times, Skillman submitted prescriptions for 200-250 grams of Lidocaine 5% Ointment that instructed patients should use "1 tube Every 8 Hours PRN" or to "apply to affected area" without any further instructions or limitations.

140.    Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% at a fraction of the cost. Lidocaine creams with 5% Lidocaine are also available over-the-counter.

141.    Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for

advertised prices in the range of $10 or less. Similarly, Lidocaine creams containing 5% Lidocaine are available from well-known retailers such as Amazon and Walmart for less than $15.

142.    Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Skillman which typically billed GEICO $1,219.20 to $1,702.00 per prescription.

143.    In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

144.    Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

145.    To-date, Defendants have submitted through Skillman more than $895,000.00 in claims to GEICO seeking reimbursement for Lidocaine 5% Ointment.

146.    In addition to the egregious number of Lidocaine 5% Ointment prescriptions, the Defendants submitted bills to GEICO through Skillman seeking reimbursement for exorbitantly priced Diclofenac Sodium Gel 3%, pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

147.    As with the prescriptions for Lidocaine 5% Ointment, Defendants solicited the Prescribers and Clinic Controllers to provide them with prescriptions for Diclofenac Sodium Gel

3% because they could readily buy it at low cost and have Skillman bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

148.    Skillman typically billed GEICO $944.00 to $1,888.00 for each prescription of Diclofenac Sodium Gel 3% dispensed.

149.    Topical diclofenac is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

150.    Topical diclofenac in 3% concentrations (i.e., Diclofenac Sodium Gel 3%) is only FDA-approved to treat a skin condition known as actinic keratosis and does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains. Nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

151.    In fact, with respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of topical NSAIDs approved by the FDA such as topical diclofenac 1% have shown they are no more effective than a placebo.  Further, there are no clinical studies to support the use of Diclofenac Sodium Gel 3% for the treatment of acute pain and no evidence that topical diclofenac in concentrations of 3% is any more effective than topical diclofenac in concentrations of 1% - which is available over-the-counter at a fraction of the cost.

152.    Moreover, the FDA requires diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

153.    A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

154.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

155.    Notwithstanding the most common uses for Diclofenac Sodium Gel 3%, or the risks associated with the drug, at times, pursuant to the fraudulent treatment protocols and collusive arrangements, Prescribers issued prescriptions for Diclofenac Sodium Gel 3% while also recommending the patient continue the use of oral NSAIDs or simultaneously prescribing oral NSAIDs and other Fraudulent Topical Pain Products.

156.    Prescribing topical diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

157.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Sodium Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

158.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

159.    By engaging in such therapeutic duplication, the Prescribers, Clinic Controllers, and Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with topical diclofenac sodium.

160.    Diclofenac Sodium Gel 3% was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

161.    In keeping with the fact Diclofenac Sodium Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Diclofenac Sodium Gel 3%.

162.    The Prescribers' follow-up examination reports virtually never addressed whether the Diclofenac Sodium Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

163.    To-date, Defendants have submitted through Skillman more than $163,000.00 in claims to GEICO seeking reimbursement for Lidocaine 5% Ointment.

164.    The Defendants' egregious billing coupled with the fact that the Prescribers failed to properly document – or even document at all – the prescriptions for Lidocaine 5% Ointment and Diclofenac Sodium Gel 3%, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of

these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

165.    Nevertheless, pursuant to fraudulent treatment protocols designed to maximize profits and the collusive agreements among the Defendants, Prescribers, and Clinic Controllers, Defendants routinely submitted through Skillman claims for reimbursement for excessive, medically unnecessary Fraudulent Topical Pain Products prescribed and dispensed simultaneously and irresponsibly without regard for patient care, including simultaneous prescriptions for multiple Fraudulent Topical Pain Products and for drugs from the same class (i.e., therapeutic duplication). For example –

- Insured JSM was allegedly involved in a motor vehicle accident on November 8, 2022 and subsequently sought treatment with Leonid Litovskiy PA ("PA Litovskiy") of LR Medical PLLC ("LR Medical") at a No-Fault Clinic located at 513 Church Avenue, Brooklyn, NY (the "Church Ave Clinic"). On December 27, 2022, Skillman dispensed Diclofenac Gel 3%, Naproxen, and Tizanidine to JSM pursuant to prescriptions issued by PA Litovskiy on December 20, 2022. The simultaneous prescription of Diclofenac Gel 3% and Naproxen constitutes therapeutic duplication.

- Insured MB was allegedly involved in a motor vehicle accident on January 2, 2023 and subsequently sought treatment with PA Litovskiy and LR Medical at the Church Ave Clinic. On April 24, 2023, Skillman dispensed Lidocaine 5% Ointment, Diclofenac Gel 3%, Diclofenac Sodium Tablets, and Tizanidine to MB pursuant to prescriptions issued by PA Litovskiy on April 4, 2023. The simultaneous prescription of Diclofenac Gel 3% and Diclofenac Sodium Tablets constitutes therapeutic duplication.

- Insured MB was allegedly involved in a motor vehicle accident on December 25, 2022 and subsequently sought treatment with Conrad Cean MD ("Dr. Cean") of Conrad F. Cean MD PLLC (the "Cean PLLC") at a No-Fault Clinic located at 480 E Jericho Turnpike, Huntington Station, NY (the "Jericho Turnpike Clinic"). On January 27, 2023, Skillman dispensed Diclofenac Gel 3% and Meloxicam to MB pursuant to prescriptions issued by Dr. Cean on January 24, 2023. The simultaneous prescription of Meloxicam and Diclofenac Gel 3% constitutes therapeutic duplication.

- Insured FL was allegedly involved in a motor vehicle accident on December 27, 2022 and subsequently sought treatment with Dr. Cean and the Cean PLLC at the Jericho Turnpike Clinic. On January 30, 2023, Skillman dispensed Diclofenac Gel 3% and Meloxicam to FL pursuant to prescriptions ordered by Dr. Cean on January 24, 2023. On May 24, 2023, Skillman again dispensed Diclofenac Gel 3% and Meloxicam to FL pursuant to prescriptions ordered by Dr. Cean on May 15, 2023. The simultaneous

prescription of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication.

- Insured KF was allegedly involved in a motor vehicle accident on October 28, 2022 and subsequently sought treatment with Scott Lyons PA ("PA Lyons") and Atlantic Medical at a No-Fault Clinic located at 55 E 115th Street, New York, NY (the "E 115th Street Clinic"). On January 6, 2023, Skillman dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, Baclofen, and Ibuprofen to KF pursuant to prescriptions issued by PA Lyons on January 4, 2023. Thereafter, on July 25, 2023, Skillman dispensed Diclofenac Gel 3%, Lidocaine 5% Ointment, Omeprazole, and Ibuprofen to KF pursuant to prescriptions ordered by PA Lyons approximately <u>eight months prior</u>, on November 13, 2022. The simultaneous prescription of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication.

- Insured EDP was allegedly involved in a motor vehicle accident on February 18, 2023 and subsequently sought treatment with Joseph Martone PA ("PA Martone") of Atlantic Medical at a No-Fault Clinic located at 441 Willis Avenue, Bronx, NY (the "Willis Ave Clinic"). On April 10, 2023, Skillman dispensed Lidocaine 5% Ointment, Diclofenac Gel 3%, Ibuprofen, and Tizanidine to EDP pursuant to prescriptions ordered by PA Martone on March 9, 2023. The simultaneous prescription of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication. Notably, the printed "prescription" records Defendants submitted in support of their fraudulent claims do not include a copy of an actual prescription or any indication of how the prescription was allegedly transmitted to the pharmacy.

- Insured EJ was allegedly involved in a motor vehicle accident on February 18, 2023 and subsequently sought treatment with PA Martone of Atlantic Medical at the Willis Ave Clinic. On April 3, 2023, Skillman dispensed Lidocaine 5% Ointment, Diclofenac Gel 3%, Tizanidine, Omeprazole, Meloxicam, and Butalbital-Acetaminophen-Caffeine to EJ pursuant to prescriptions ordered by PA Martone on March 27, 2023. The simultaneous prescription of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication. Notably, the printed "prescription" records Defendants submitted in support of their fraudulent claims do not include a copy of an actual prescription or any indication of how the prescription was allegedly transmitted to the pharmacy.

- Insured AJ was allegedly involved in a motor vehicle accident on February 24, 2023 and subsequently sought treatment with PA Martone of Atlantic Medical at the Willis Ave Clinic. On April 11, 2023, Skillman dispensed Diclofenac Gel 3%, Lidothol 4.5-5% Patches, Ibuprofen, and Tizanidine to AJ pursuant to prescriptions ordered by PA Martone on March 23, 2023. The simultaneous prescriptions of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication.

- Insured ES was allegedly involved in a motor vehicle accident on February 17, 2022 and subsequently sought treatment with Lyudmila Poretskaya MD ("Dr. Poretskaya") of J.R. Medical PC ("J.R. Medical") at the Jericho Turnpike Clinic. On June 20, 2022, Skillman dispensed Diclofenac Gel 3% and Naproxen to ES pursuant to a template prescription form issued by Dr. Poretskaya nearly <u>two and a half months prior</u> on April 12, 2022. The simultaneous prescription of Diclofenac Gel 3% and Naproxen

constitutes therapeutic duplication.

**ii.    The Fraudulent Sumatriptan 5% Cream Prescriptions**

166.    The Defendants also submitted excessive claims for reimbursement for Sumatriptan in the form of a compounded topical cream – Sumatriptan 5% Cream – typically charging $1,133.60 per prescription.

167.    As outlined above, the prescriptions for Sumatriptan 5% Cream were issued by Dr. Patrick and routed to the Defendants pursuant to fraudulent treatment protocols rather than genuine patient care.

168.    This fraudulent treatment protocol included Dr. Patrick virtually always prescribing Sumatriptan 5% Cream to patients at the time of their initial examination based on a diagnosis of "post-traumatic headaches."

169.    Sumatriptan is a prescription medication which, in oral form, is FDA-approved for the acute treatment of migraines after a clear diagnosis of migraine headaches has been established. It is used in injectable form to treat cluster headaches.

170.    Sumatriptan is not indicated for the prevention or treatment of any other headache symptoms.

171.    Sumatriptan works by narrowing blood vessels in the brain, preventing pain signals from being sent to the brain, and blocking the release of certain substances in the brain that cause migraines. Sumatriptan, however, does not prevent future migraines or how often an individual experiences migraine symptoms.

172.    Sumatriptan, in the form of an oral capsule is FDA-approved, whereas Sumatriptan in a topical compounded form (i.e., Sumatriptan 5% Cream) is not an FDA-approved pharmaceutical product.

173.    Moreover, passive transdermal delivery of Sumatriptan (i.e., Sumatriptan in the form of a topical cream) is ineffective in the treatment of migraines because there is insufficient data to demonstrate sufficient absorption through the skin.

174.    Nevertheless, pursuant to the fraudulent scheme and to maximize profits, the Prescribers issued prescriptions for Sumatriptan 5% Cream despite the fact topical Sumatriptan is ineffective and there is a readily available non-compounded oral form available at most well-known pharmacy retailers at a fraction of the cost, including CVS and Walgreens for advertised prices in the range of approximately $22.24 to $24.37. However, in accordance with the scheme, Prescribers never recommended the Insureds first try over-the-counter drug products or inexpensive, commercially available prescription drug products, such as Sumatriptan oral tablets.

175.    To-date, Defendants have submitted through Skillman nearly $400,000.00 in claims to GEICO seeking reimbursement for Sumatriptan 5% Cream.

### iii.    The Fraudulent Prescriptions for Unapproved Products

176.    In keeping with the fact that the Defendants, Prescribers, and Clinic Controllers acted pursuant to fraudulent treatment protocols designed to maximize profits, and with gross indifference to patient care and safety, the Defendants also obtained prescriptions for unapproved drugs, primarily in the form of Somnicin products and Lidothol Patches, and used them to submit more than $412,000.00 in fraudulent claims to GEICO.

177.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

178.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

179.    Federal law requires all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing.  The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality. Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

180.    Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions when there is no FDA-approved drug to treat that condition. See e.g., https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.  No exception applies to Lidothol Patches or Somnicin products that might allow them to be marketed as prescription drug products.

181.    The FDA considers Somnicin and Lidothol Patches to be unapproved drugs.

182.    Somnicin is a compounded dietary supplement – containing multiple nutritional supplements, such as melatonin, 5-HTP or 5-hydroxytryptophan (also known as oxitriptan), L-tryptophan, vitamin B6, and magnesium – marketed to alleviate insomnia and sleep issues, while concomitantly reducing anxiety, stress, and depression. Notably, there are no published, peer-reviewed, controlled studies to support that patients who suffer from insomnia or sleeping issues have obtained any benefit from using Somnicin.

183.    Moreover, unlike other pharmaceutical products, dietary supplements do not require FDA approval prior to being sold or marketed, nor are manufacturers required to prove their medical efficacy.  Therefore, Somnicin is not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products.

184.    Nevertheless, Skillman billed GEICO over $242,000.00 for dispensing Somnicin products to GEICO Insureds.

185.    Defendants also submitted $170.000.00 for dispensing purported pharmaceutical pain patches to GEICO Insureds denominated as "Lidothol External Patch 4.5-5 MG" (i.e., Lidothol Patches) which were produced or packaged by an unregistered supplier.

186.    Skillman, as a pharmacy licensed in New York State, is prohibited from holding for sale or selling drugs that are sourced from drug suppliers not licensed in New York, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

187.    All Lidothol Patches dispensed and billed by the Defendants through Skillman were purchased or sourced from Terrain Pharmaceuticals, LLC ("Terrain Pharmaceuticals").

188.    At the time Skillman purchased and dispensed the Lidothol Patches, Terrain Pharmaceuticals was not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, was not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale in New York.

189.    Skillman, as noted above, is prohibited from selling drugs that are purchased from drug suppliers not licensed in New York and from holding for sale or selling Lidothol Patches purchased from Terrain Pharmaceuticals.

190.    To the extent that the Defendants somehow circumvented purchasing Lidothol Patches directly from an unlicensed supplier, the patches remain "unapproved" drugs and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

191.    Similarly, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like Somnicin or Lidothol Patches, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any out the ordinary risk to the patient.

192.    By purchasing cheap, unapproved drugs sourced from unapproved suppliers – and then dispensing those drugs in large volumes to Insureds – the Defendants endangered patients and violated material regulatory and licensing requirements imposed on pharmacies in New York, while generating huge profits from the fraudulent claims submitted to the New York automobile insurance industry.

193.    In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Skillman without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labelling – solely to exploit the patients for financial gain, without regard for genuine patient care.

### iii.    The Fraudulent Naproxen-Esomeprazole Prescriptions

194.    In addition to the Fraudulent Topical Pain Products and unapproved products, Skillman dispensed and billed for Fraudulent Naproxen-Esomeprazole pursuant to Defendants' fraudulent scheme and collusive arrangements with Clinic Controllers and Prescribers.  The Fraudulent Naproxen-Esomeprazole was clinically inappropriate, medically unnecessary, and prescribed at the risk of patient health and safety. Nevertheless, Defendants submitted more than $244,000.00 in claims seeking reimbursement for Fraudulent Naproxen-Esomeprazole.

195.    Like the Fraudulent Topical Pain Products, the Defendants targeted the Fraudulent Naproxen-Esomeprazole solely based on the medication's exorbitant pricing and high profit margins and without regard to genuine patient care.

196.    Naproxen-Esomeprazole is a multi-ingredient oral medication containing naproxen, a nonsteroidal anti-inflammatory drug, and esomeprazole, a proton-pump inhibitor ("PPI"). The naproxen is intended to relieve pain and inflammation, while esomeprazole is intended to decrease the risk of developing stomach ulcers.

197.    Naproxen-Esomeprazole is only FDA-approved to treat symptoms relating to osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in patients, and to decrease the risk of developing NSAID-related gastric ulcers. However, the FDA indicates that Naproxen-Esomeprazole should not be used as the first course of treatment for acute pain.

198.    Moreover, the American College of Gastroenterology has published guidelines that indicate certain risk factors that put patients at an increased risk of NSAID-related gastrointestinal injuries, thereby necessitating a PPI like esomeprazole. These risk factors include a patient's prior medical history of complicated gastrointestinal ulcers, patients taking blood thinner for the prevention of stroke or heart attack, or patients over the age of 65 years old who are at increased risk for NSAID-related injury.

199.    Despite the FDA-approved indications for the prescription and use of Naproxen-Esomeprazole, and widely accepted guidelines relating to the medical necessity of PPIs, the Prescribers prescribed, and the Defendants dispensed Fraudulent Naproxen-Esomeprazole – a combined NSAID and PPI medication – to Insureds with no documented history of arthritis related conditions and/or any other factors which put patients at moderate to high risk of NSAID-associated gastric ulcers.

200.    Moreover, the Prescribers prescribed the exorbitantly priced Fraudulent Naproxen-Esomeprazole to Insureds despite the fact most Insureds were only involved in minor fender-bender type motor vehicle accidents and there are no medical studies supporting the efficacy of

this product in treating musculoskeletal pain experienced as a result of a motor vehicle accident.

201.    Nevertheless, to generate and maximize profits, the Defendants steered the Prescribers and Clinic Controllers to prescribe the exorbitantly-priced Fraudulent Naproxen-Esomeprazole – typically dispensed and billed at $2,144.64 for each prescription – without regard for medical necessity or genuine patient care.

202.    Notably, each of the ingredients contained in the Fraudulent Naproxen-Esomeprazole is available over-the counter without a prescription at a fraction of the cost.

203.    In further keeping with the Defendants' fraudulent scheme, the follow-up examination reports virtually never addressed whether the Fraudulent Naproxen-Esomeprazole prescribed provided any relief to the patients or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects, or if the patient was even taking the Fraudulent Pharmaceutical in the first instance.

204.    The Defendants chose the Fraudulent Naproxen-Esomeprazole because they knew that (i) similar over-the-counter medications are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Naproxen-Esomeprazole, which is seemingly non-offensive, at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant charges.

### (2)    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

205.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of

the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

206.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

207.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

208.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

209.    The Defendants intentionally targeted the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through Skillman and to maximize their profits.

210.    In support of its charges, Skillman typically submitted, among other things, printouts of Skillman's prescription records, an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product, and a purported delivery receipt.

211.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants through Skillman are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

212.    The Defendants never actually paid the targeted, expensive "average wholesale price" of the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole that they

dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for these Fraudulent Pharmaceuticals.

213.    The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole they targeted to use in connection with the billing submitted through Skillman, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA-approved, proven effective medications or commercially available over-the-counter products.

214.    Further, upon information and belief, the Defendants often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

### B.    Defendants' Billing for the Fraudulent Equipment

215.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), and whirlpool baths.

216.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

217.    To ensure that Insureds' $50,000.00 in No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

218.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

219.    As it relates to DME and OD, prior to 2022, the New York Fee Schedule set forth the maximum charges as follows:

(a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices]…shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided…if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1)    the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%; or

(2)    the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

220.    As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

221.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

222.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

223.    The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.

224.    Where a specific piece of DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer, such as GEICO, to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

225.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

226.    To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid Fee Schedule, the definitions set forth by Palmetto control to determine whether an item of DME or OD qualifies for reimbursement under a specific HCPCS Code.

227.    Additionally, many HCPCS Codes relate to OD that have either been prefabricated, custom-fitted, and/or customized.  Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.  As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

228.    In an effort to reduce instances of fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the old New York State Medicaid Program's Durable Medical Equipment Fee Schedule (i.e., the Medicaid Fee Schedule) with an updated New York State Workers' Compensation Durable Medical Equipment Fee Schedule (i.e., the DME Fee Schedule) that became effective on April 4, 2022.

229.    Among other things, the DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges.  The charges for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

230.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the DME Fee Schedule.

231.    However, between the time period of April 4, 2022 and May 31, 2023, to address the of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency

amendment explaining the standard for reimbursement when there is no price contained in the DME Fee Schedule.

232.    For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.  See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

233.    When a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

    (i)    The provider is in compliance with all significant statutory and regulatory requirements;

    (ii)    The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner licensed to issue such prescriptions;

    (iii)    The prescription for DME or OD is not based on any unlawful financial arrangement;

    (iv)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

    (v)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

    (vi)    The fee sought for the DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (or Medicaid Fee Schedule) or the standard used for a Non-Fee Schedule item.

234.    Despite these representations, Defendants submitted over half a million dollars in fraudulent claims seeking reimbursement for Fraudulent Equipment.  The claims for Fraudulent

Equipment were fraudulent in that: (i) they were based on illegitimate prescriptions which often contained stamped or photocopied Prescriber signatures; (ii) the prescriptions were generated pursuant to predetermined protocols and unlawful kickback arrangements, rather than medical necessity and genuine patient care; (ii) they resulted from decisions made by laypersons rather than prescriptions issued by Prescribers licensed to issue such prescriptions; (iv) they fraudulently misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate reimbursement rate and/or fraudulently misrepresented that the charges sought were less than or equal to the maximum permissible reimbursement amount.

### (1) The Fraudulent Prescriptions and the Defendants' Misrepresentations Regarding the Fraudulent Equipment Dispensed and Billed

235.    Like the Fraudulent Pharmaceuticals, the Fraudulent Equipment was prescribed and dispensed pursuant to collusive agreements with the Clinic Controllers and Prescribers who, in exchange for kickbacks and other financial incentives, issued prescriptions for the specifically, targeted Fraudulent Equipment and routed those prescriptions to the Defendants.

236.    In fact, nearly half of the prescriptions for Fraudulent Equipment dispensed by Skillman were issued by Prescribers in their capacity as employees of Dr. Landow and his professional corporations. As stated above, these Prescribers are also among the top referral sources of prescriptions for Fraudulent Pharmaceuticals dispensed and billed by Skillman.

237.    Based on these unlawful financial arrangements, the Defendants received prescriptions for medically unnecessary Fraudulent Equipment pursuant to predetermined prescription protocols, including prescriptions that (i) contained a photocopied or stamped signature of the Prescriber; and/or (ii) were issued on a date the Prescriber did not treat or otherwise examine the Insured.  Samples of prescriptions for Fraudulent Equipment containing stamped or photocopied signatures are attached at Exhibit "5"

238.    As with the prescriptions for the Fraudulent Pharmaceuticals, the prescriptions for the Fraudulent Equipment were never given to the Insureds to fill, but rather, pursuant to the scheme, were routed directly to Skillman by the Clinic Controllers and Prescribers to ensure that the Insureds did not fill the prescriptions with legitimate DME and OD retailers.

239.    The Fraudulent Equipment was dispensed to Insureds in large plastic by clinic receptionists, at times without any instructions on how to use the Fraudulent Equipment.

240.    The Defendants caused the Clinic Controllers and Prescribers to generate and route to Skillman prescriptions for both Fee Schedule and Non-Fee Schedule items which Defendants used to (i) misrepresent the nature and quality of the items intended by the prescriptions; (ii) misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO; and (iii) misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

241.    As part of the scheme, the Defendants ensured that the prescriptions for Fraudulent Equipment were written in a generic, vague, non-descript manner so that Defendants could have the flexibility to designate the products that would result in the highest forms of reimbursement from GEICO.

242.    The Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

243.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

244.    Khaimov was and is not legally authorized to prescribe DME and/or OD.  Similarly, Skillman is not a licensed professional corporation and does not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

245.    However, when the Defendants received the vague and generic prescriptions for Fraudulent Equipment, many of the items listed in those prescriptions were, by design, not specific enough to identify a specific piece of Fraudulent Equipment that was to be dispensed to the Insured.

246.    In a legitimate setting, upon receiving such a vague and generic, the DME/OD provider would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

247.    To the contrary, whenever the Defendants received vague and generic prescriptions that identified types of Fraudulent Equipment with multiple potential HCPCS Codes – which are based on the specific and unique features associated with each variation of the items – the Defendants chose to bill GEICO using specific HCPCS Codes thereby asserting that they provided those unique pieces of Fraudulent Equipment to the Insureds.

248.    In each and every circumstance where the vague and generic prescriptions allowed the Defendants to choose a unique piece of Fraudulent Equipment, the Defendants chose to purportedly provide the Insured with the piece of Fraudulent Equipment associated with a HCPCS Code with a higher maximum reimbursable rate under the applicable fee schedule.

249.    For example, the Defendants often received vague and generic prescriptions for a "Lumbar Sacral Supports" without any further specification.

250.    This vague and generic language for lumbar supports directly relates to over 20

different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, including:

    (vii)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

    (ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

    (iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

    (i)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

    (ii)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

    (iii)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

    (iv)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

    (v)    HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

    (vi)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

    (vii)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

    (viii)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(ix)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(x)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xi)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xii)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiii)    HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xiv)    HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xv)    HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xvi)    HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xvii)    HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xviii)    HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xix)    HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xx)    HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a

maximum reimbursement rate of $741.59.

251.    Neither Skillman nor Khaimov is legally permitted to determine which of the above-available options were best suited for the Insureds who received the generic prescriptions for a "Lumbar Sacral Support".

252.    Nevertheless, the Defendants never contacted the Prescribers who purportedly issued the vague and generic prescriptions, but rather took it upon themselves to decide which specific type of Fraudulent Equipment they would dispense and bill for.

253.    Pursuant to these generic prescriptions, the Defendants typically submitted charges of $398.36 under HCPCS Code L0642 or $844.00 to $1,041.07 under HCPCS Code L0650.  The lumbar supports associated with these HCPCS Codes are among those with the highest maximum reimbursement amounts in the Fee Schedule.

254.    As an additional example, in response to prescriptions for "EMS Units", Defendants purported to provide Insureds with equipment associated with HCPCS Code E0747 resulting in a charge to GEICO of $575.84 per device.   HCPCS Code E0747 is for a specific piece of equipment, namely, an Osteogenesis Stimulator.

255.    Osteogenesis Stimulators perform extremely different functions than EMS Units. Specifically, an EMS Unit (**E**lectronic **M**uscle **S**timulation) is used to provide muscle stimulation to decrease muscle spasms or promote muscle growth, while Osteogenesis Stimulators are used to encourage bone growth and accelerate fracture healing.

256.    Skillman dispensed and billed for these items under HCPCS Code E0747 even though there was absolutely no evidence of bone fractures in the patients who received the devices, and the fact the prescriptions called for an entirely different device.

257.    At times, the Defendants submitted bills to GEICO that fraudulently

misrepresented that they dispensed "custom fitted" pieces of Fraudulent Equipment.

258. Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is "off-the-shelf" or specifically "custom-fitted" for that individual patient.

259. In order to help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

260. One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

261. By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the

provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

262.    As shown in the claims identified within Exhibit "2", the Defendants often billed for Fraudulent Equipment that was purportedly "custom-fitted" for individual Insureds when, in fact, the items were never custom fitted, as that term is defined by Palmetto.

263.    In fact, Insureds denied ever being measured or fitted for any Fraudulent Equipment, and there is no evidence in the Insureds' records to indicate they were ever measured or fitted for these devices.

264.    In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, the Defendants submitted bills to GEICO seeking reimbursement for specific types of Fraudulent Equipment with HCPCS Codes that bore no relation to the items identified in the prescriptions.

265.    By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants represented that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

266.    However, the Fraudulent Equipment the Defendants purported to dispense did not match the HCPCS Codes identified in the bills they submitted.

267.    Instead, the Defendants provided Insureds with inexpensive and poor-quality

Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes under which the Defendants sought reimbursement, but rather was only reimbursable under HCPCS Codes with significantly lower maximum reimbursement rates.

268.    For example, Defendants routinely billed GEICO under HCPCS Code E0271 or E0272 – charging $157.21 or $155.52, respectively – pursuant to prescriptions calling for an "Egg Crate Mattress".

269.    HCPCS Codes E0271 and E0272 apply to innerspring or foam mattresses used on hospital beds, not to a foam mattress topper or pad in the shape of an egg crate.

270.    In each of the claims where the Defendants billed for Fraudulent Equipment under HCPCS Code E0271 or E0272, they fraudulently misrepresented that they provided the Insureds with equipment that satisfied the requirements of HCPCS Code E0271 or E0272.

271.    However, despite billing GEICO using HCPCS Code E0271 and E0272, the Defendants did not provide patients with innerspring or foam mattresses. To the extent any items were provided, they were mattress pads or toppers in the shape of egg crates – Fee Schedule items listed under HCPCS Code E0199 and defined as a "Dry pressure pad for mattress, standard mattress length and width" with a maximum reimbursement rate of $19.48.

272.    In keeping with the fact Defendants purchased inexpensive, poor-quality Fraudulent Equipment to dispense to Insureds, Defendants purchased the DME and OD from Comfortland Medical Inc. ("Comfortland").

273.    Upon information and belief, Comfortland sells cheap and/or knockoff DME and OD to providers such as Skillman so that the providers can illegally maximize profit margins in the manner described herein. In fact, Comfortland and its owner, David Tsui ("Tsui"), have been sued multiple times based on allegations involving patent infringement and unfair competition.

See Posture Pro, Inc. v. Comfortland Medical, Inc. et al., 8:13-cv-01252-JVS-AN, Aspen Medical Products, Inc. et al v. Comfortland Medical, Inc., 8:16-cv-02001-AG-JCG.  Tsui personally pleaded guilty to his involvement in a Medicare scheme that involved filing false claims for diabetic shoes and shoe inserts provided to Medicare beneficiaries in excess of $500,000.00. See United States of America v. Tsui, et al., (N.C.M.D. 2007).  Moreover, in 2019 Tsui agreed to pay the Federal government over $414,000.00 for allegedly accepting illegal kickbacks in exchange for arranging referrals for prescription compound drugs.

274.    The Defendants, by purchasing inexpensive and poor-quality Fraudulent Equipment, which they used to fill the generic and vague prescriptions provided by the Clinic Controllers and Prescribers, executed a scheme to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS Codes identified in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

i.    **The Defendants' Fraudulent Misrepresentations Regarding Non-Fee Schedule Items Dispensed to Insureds**

275.    The Defendants also submitted bills to GEICO for Non-Fee Schedule items. In doing so, the Defendants once again requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment provided to Insureds.

276.    However, as part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items virtually always misrepresented the permissible reimbursement amount.

277.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

278.    By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

279.    However, in virtually all of their claims to GEICO for Non-Fee Schedule items, the Defendants submitted bills with charges that significantly inflated the permissible reimbursement amounts for the Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain.

280.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by once again providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

281.    When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently misrepresented that they were for 150% of the Defendants' acquisition cost for purportedly high-quality items. In actuality, the Defendants' legitimate acquisition costs were for the low-quality items and, therefore, significantly less.

282.    Pursuant to the scheme designed to maximize their profits, the Defendants purposefully attempted to conceal their efforts to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

283.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items with the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges listed in the bills.

284.    For example, the Defendants billed GEICO for infrared heat lamps under HCPCS

Code E0205 with a charge of $296.27 per unit thereby representing that this is a permissible reimbursement amount for the Non-Fee Schedule item.

285.    To the extent that any items were provided, the infrared lamps were low quality items and the permissible reimbursement rate was significantly less than the $296.27 charged by the Defendants.

286.    The Defendants' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to GEICO and resulted in Skillman obtaining payment from GEICO under the New York "No-Fault" laws to which the Defendants were never entitled.

287.    When the Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS Codes listed on the bills properly described the type of Fraudulent Equipment that was provided.

288.    As indicated above, the applicable fee schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

289.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

290.    By submitting bills to GEICO containing specific HCPCS Codes, the Defendants represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

291.    To-date, Defendants have submitted more than half a million dollars in claims seeing reimbursement for the Fraudulent Equipment.

292.    In each of their claims for reimbursement for Fraudulent Equipment, the

Defendants fraudulently misrepresented to GEICO that (i) the HCPCS Codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds; (ii) the charges contained in the bill represented the permissible reimbursement rates for the Fraudulent Equipment purportedly provided, and (ii) the specific Fraudulent Equipment, and its medically necessity, was determined by a healthcare provider authorized to prescribe such equipment, rather than an unauthorized layperson.

C.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers, and Clinic Controllers**

293.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to Skillman for large volumes of the Fraudulent Pharmaceuticals and Fraudulent Equipment pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

294.    New York's statutory framework provides, among other things, that healthcare service providers such as Skillman are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs or goods so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

295.    Here, Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals and Fraudulent Equipment and direct those prescriptions to Skillman so that they could bill GEICO huge sums.

296.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the

collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, cost and attention to fiscal responsibility, or pharmacologic outcomes.

297.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

298.    Also in furtherance of the scheme, the Prescribers issued, or purported to issue, intentionally vague and generic prescriptions for Fraudulent Equipment prescribed to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, without regard to genuine patient care, so as to enable the Defendants to exploit the Fee Schedule through the manipulation of HCPCS Codes.

299.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Equipment to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Equipment, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Equipment was

dispensed pursuant to decisions by laypersons, not based upon prescriptions issued by the Prescribers licensed to issue such prescriptions; the Fraudulent Equipment dispensed did not meet the criteria to qualify for reimbursement under the HCPCS Codes identified in the bills Defendants submitted; and the Defendants' charges for the Fraudulent Equipment misrepresented the maximum permissible rates under the applicable fee schedules.

300.    The Defendants, in collusion with the Prescribers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy or DME/OD supplier of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment were directed to Skillman notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were located in counties far from Skillman and (ii) there were countless other pharmacies and DME/OD suppliers located much closer to the No-Fault Clinics and the patients.

301.    The Fraudulent Pharmaceuticals and Fraudulent Equipment was dispensed to Insureds, often by the front desk staff at the No-Fault Clinics, without them ever seeing the actual written prescription and, in many cases, without the patient even knowing that they were to receive Fraudulent Pharmaceutical and/or Fraudulent Equipment.

302.    The Defendants, Prescribers, and Clinic Controllers did not give Insureds the option to have their prescriptions filled at a pharmacy or DME/OD supplier of their choosing to ensure that the prescriptions were filled by Skillman, and to ensure that the Defendants benefitted financially from the prescriptions.

303.    The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

304.    The Prescribers had no legitimate medical reason to prescribe the Fraudulent Equipment in large quantities to their patients.  To the extent a legitimate medical reason did exist, the vague and generic prescriptions ensured the Defendants were able to dispense Fraudulent Equipment of their own choosing without any regard for medical necessity or the equipment the Prescriber intended the Insured to receive.

305.    The Prescribers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman rather than to a multitude of other pharmacies or DME/OD suppliers that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

306.    The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally issuing prescriptions for medically unnecessary Fraudulent Pharmaceuticals and Fraudulent Equipment, and directing those prescriptions to Skillman, unless they profited from their participation in the illegal scheme.

307.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Pharmaceuticals and/or Fraudulent Equipment, and the Prescribers and Clinic Controllers would not have directed the prescriptions to Skillman.

308.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

309.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives,

for each prescription for the Fraudulent Pharmaceuticals and Fraudulent Equipment that was dispensed by Skillman.

310.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

## IV.    The Defendants' Submission to GEICO of Fraudulent NF-3 and HCFA 1500 Forms

311.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Skillman seeking payment for pharmaceuticals and DME/OD for which they are ineligible to receive.

312.    These forms, including NF-3 Forms, and other supporting records that the Defendants submitted or cause to be submitted to GEICO, were false and misleading in the following material respects:

    i.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals and Fraudulent Equipment were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals and Fraudulent Equipment were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for medical necessity or genuine patient care;

    ii.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Skillman for the Fraudulent Pharmaceuticals and Fraudulent Equipment, in exchange for the payment of kickbacks and other financial incentives;

    iii.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed and billed for Fraudulent

Pharmaceuticals and Fraudulent Equipment pursuant to illegal, invalid, and duplicitous prescriptions;

iv.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

v.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants dispensed the Fraudulent Pharmaceuticals and Fraudulent Equipment pursuant to decisions made by laypersons rather than lawful prescriptions issued by medical professionals licensed to issue such prescriptions;

vi.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally submitted bills under HCPCS Codes seeking reimbursement for Fraudulent Equipment that did not meet the specific requirements for the codes billed;

vii.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally mispresented that the reimbursement rate for the Non-Fee Schedule items dispensed were less than or equal to the maximum permissible reimbursement amounts when, in fact, they were grossly inflated and well above the maximum permissible reimbursement amounts.

313.    As a direct result of Defendants' scheme, and in reliance on the fraudulent billing submissions made through Skillman, GEICO was led to voluntarily issue payments to Defendants totaling approximately $1,437,600.00.

**V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

314.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

315.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals and Fraudulent Equipment, the Defendants have gone to great lengths to systematically conceal their fraud.

316.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals and Fraudulent Equipment were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for medical necessity and genuine patient care; (ii) the Defendants' billing submissions misrepresented the permissible reimbursement rates for the Fraudulent Pharmaceuticals and Fraudulent Equipment dispensed; and (iii) Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

317.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals and Fraudulent Equipment, when viewed in isolation, did not reveal its fraudulent nature.

318.    The Defendants have hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through Skillman. These law firms routinely file expensive and time-consuming collection litigation and/or arbitration proceedings, in piece-meal fashion, against GEICO and other insurers if the charges are not promptly paid in full as part of the scheme and to monetize the Defendants' fraudulent activity.   In fact, the Defendants continue to have legal counsel pursue individual collection actions against GEICO and other insurers without regard for the fact Skillman was engaged in fraud.

319.    The Defendants' collection efforts through hundreds of separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since the Defendants know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

320.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $1,437,600.00 representing payments made by GEICO based upon the fraudulent charges in the bills submitted by the Defendants.

321.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

322.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

323.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $867,900.00 in fraudulent billing for the Fraudulent Pharmaceuticals and Fraudulent Equipment that the Defendants submitted, or caused to be submitted, to GEICO through Skillman.

324.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Pharmaceuticals and Fraudulent Equipment were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols, solely for financial gain and without regard for genuine patient care.

325.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives.

326.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Defendants provided Fraudulent Pharmaceuticals and Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions for medically necessary items issued by healthcare providers licensed to issue such prescriptions.

327.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the

Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that they acquired at low cost and had Skillman dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

328.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Defendants' bills submitted to GEICO seeking reimbursement for the Fraudulent Equipment misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate the reimbursement rates, as HCPCS Codes identified in the bills did not accurately represent the equipment provided to Insureds.

329.    Skillman has no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted and continue to submit fraudulent claims to GEICO for the Fraudulent Pharmaceuticals and Fraudulent Equipment pursuant to illegal, invalid, unauthorized, and duplicitous prescriptions.

330.    The Defendants violated New York State regulatory and licensing requirements, rendering Skillman ineligible to receive reimbursement for No-Fault Benefits.

331.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Skillman has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against Khaimov and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

333.   Skillman is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

334.   Khaimov and John Doe Defendants "1" through "10" (the "John Doe Defendants") knowingly conducted and/or participated, directly or indirectly, in the conduct of Skillman's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail/wire fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails and/or wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than three and a half years, and to continue efforts to collect on those charges, seeking payments that Skillman was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; (iv) the Fraudulent Pharmaceuticals and Fraudulent Equipment was provided pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (v) the Defendants intentionally misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate the reimbursement rates, as the HCPCS Codes identified in the bills did not accurately represent the equipment provided to Insureds;; and (vii) the Defendants intentionally targeted a specific set of pharmaceutical products that that they acquired at low cost and had Skillman dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain

in violation of law. The fraudulent bills and corresponding mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

335.     Skillman's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail/wire fraud are the regular way in which Khaimov and the John Doe Defendants operated Skillman, inasmuch as Skillman never was eligible to bill for or collect No-Fault Benefits, and acts of mail/wire fraud therefore were essential in order for Skillman to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail/wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Skillman to the present day.

336.     Skillman is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Skillman in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

337.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,437,600.00 pursuant to the fraudulent bills submitted by the Defendants through Skillman.

338.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against Khaimov and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

339.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

340.    Skillman is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

341.    Khaimov and the John Doe Defendants are employed by and/or associated with Skillman.

342.    Khaimov and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Skillman's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail/wire fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails and/or wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than three and half years, and to continue efforts to collect on those charges, seeking payments that Skillman was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, and duplicitous

prescriptions; (iv) the Fraudulent Pharmaceuticals and Fraudulent Equipment was provided pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (v) the Defendants intentionally misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate the reimbursement rates, as the HCPCS Codes identified in the bills did not accurately represent the equipment provided to Insureds;; and (vii) the Defendants intentionally targeted a specific set of pharmaceutical products that that they acquired at low cost and had Skillman dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law. The fraudulent bills and corresponding mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

343.    Khaimov and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO and by continuing to seek collection of those fraudulent charges.

344.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,437,600.00 pursuant to the fraudulent bills submitted by the Defendants through Skillman.

345.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against All Defendants**
**(Common Law Fraud)**

346.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

347.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals and Fraudulent Equipment under the name of Skillman.

348.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Skillman acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals and Fraudulent Equipment to Skillman in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Skillman acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions;  (iv) in every claim, the representation that Skillman acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in

fact the Defendants dispensed the Fraudulent Pharmaceuticals and Fraudulent Equipment pursuant to decisions made by laypersons rather than lawful prescriptions issued by medical professionals licensed to issue such prescriptions; (v) in every claim, the representation that Skillman acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (vi) in every claim, the representation that Skillman acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants' bills submitted to GEICO seeking reimbursement for the Fraudulent Equipment misrepresented the type and nature of the Fraudulent Equipment provided to Insureds in order to fraudulently inflate the reimbursement rates, as the HCPCS Codes identified in the bills did not accurately represent the equipment provided to Insured.

349.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Skillman that were not compensable under the No-Fault Laws.

350.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,437,600.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Skillman.

351.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

352.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

353.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

354.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

355.    When GEICO paid the bills and charges submitted by or on behalf of Skillman for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

356.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

357.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

358.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $1,437,600.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Claim for Relief against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Skillman has no right to receive payment for any pending bills, amounting to approximately $867,900.00 in charges submitted to GEICO;

B. On the Second Claim For Relief against Defendant Khaimov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,437,600.00, together with together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

C. On the Third Claim For Relief against Defendant Khaimov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,437,600.00 together with together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Claim For Relief against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,437,600.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E. On the Fifth Claim For Relief against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,437,600.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
April 10, 2025

RIVKIN RADLER LLP

By:    /s/ *Michael A. Sirignano*
            Michael A. Sirignano

Barry I. Levy
Joanna Rosenblatt
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4834-8700-7478, v. 1